Argued February 16, reversed April 11, argued on rehearing
October 3, former opinion withdrawn, reversed and
remanded November 14, 1956

## TODD *v.* OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA

295 P. 2d 870
3C3 P. 2d 492

*James H. Clarke,* Portland, argued the cause for appellant. With him on the briefs were Koerner, Young, McColloch & Dezendorf, and Wayne Hilliard, all of Portland.

*Nels Peterson,* Portland, argued the cause for respondent. On the brief were Peterson & Pozzi, Berkeley Lent, and Norman N. Griffith, all of Portland.

Before TOOZE, Acting Chief Justice, and LUSK, BRAND, and PERRY, Justices.

**PERRY, J.**

The plaintiff, having suffered from an accident, commenced this action to recover weekly indemnity payments as provided in defendant's accident policy.

This policy contract provided, if plaintiff sustained bodily injuries, that payment of benefits would be made:

"A. If such injuries, directly and independently of all other causes, shall within twenty days from the date of accident, wholly and continuously disable the Insured and prevent him from performing each and every duty pertaining to his occupation, the Company shall pay the weekly accident indemnity for the period of such continuous total disability, but not exceeding fifty-two consecutive weeks. After the payment of weekly accident indemnity for fifty-two weeks as aforesaid the Company shall continue the payment of the weekly accident indemnity thereafter so long as the Insured shall be wholly and continuously disabled by such injuries from engaging in any occupation or employment for wage or profit.

"B. Or, if such injuries, directly and independently of all other causes, shall, within twenty days from the date of accident or immediately following a period of total disability covered under Section A, continuously disable and prevent the Insured from performing one or more important daily duties pertaining to his occupation, the Company shall pay for the period of such disability, but not exceeding twenty-six consecutive weeks, a weekly accident indemnity of one-half of the amount payable for total disability.

"Indemnity shall only be paid under this Part for any period of disability during which the Insured is under the regular care and attendance of a legally qualified physician or surgeon other than himself."

and the policy excluded "death, disability or other loss caused or contributed to (1) by bodily or mental infirmity, * * * or (3) by any kind of sickness, * * *."

The defendant had paid to the plaintiff the weekly indemnity of $50 per week for a total occupational disability to the extent of $807.14, and then refused to acknowledge further liability under the contract.

In answer to the plaintiff's complaint, the defendant alleged that the disability suffered by the plaintiff was caused or contributed to by bodily infirmity and sickness as excluded from coverage in the exception clause, and further asked for affirmative relief, seeking recovery of the payments as previously made.

A jury trial was waived, and the trial court made the following Findings of Fact:

### "III.

"That on or about November 11, 1952 while said policy was in full force and effect, the plaintiff sustained accidental bodily injuries entitling him under the terms and provisions of said policy to weekly indemnity in the sum of $50.00 from and after November 11, 1952; that plaintiff duly made claim under said policy and was paid weekly indemnity as provided by the terms of said policy until March 5, 1953 when said payments were discontinued by said defendant.

### "IV.

"That plaintiff duly made demand upon defendant for the payment of the benefits provided by said policy but said defendant failed and refused to pay the same and defendant became indebted to the plaintiff in the sum of $2,221.42 for weekly indemnity payments of $50.00 per week from March 5, 1953 to January 13, 1954.

* * * * *

## "VI.

"That defendant did not mistakenly pay plaintiff weekly benefits of $50.00 per week in the total sum of $807.14, but paid said sum as required by said policy; that plaintiff's accidental bodily injuries were caused directly and independently of all other causes from accidental bodily injuries and his disability was not caused or contributed to by bodily infirmity or sickness including any pre-existing arthritic condition and/or pre-existing sinus condition and plaintiff was not rendered ineligible to receive the weekly benefits provided under said policy but on the contrary, was entitled to recover the same."

Upon these Findings of Fact, the trial court concluded that the plaintiff should recover judgment against the defendant in the sum of $2,221.42, as total disability payments due under the contract accruing subsequent to the last payment made by the defendant on March 5, 1953. Judgment was entered accordingly, and the defendant has appealed.

In general, the defendant contends there is no substantial evidence that the accidental bodily injuries suffered by the plaintiff entitle him to a recovery within the terms of the policy contract.

The solution of the problem lies in the evidence adduced as applied to the interpretation placed upon the insuring clauses and their restrictions. The evidence discloses that plaintiff, 61 years of age, while employed as a taxi driver, and at a time when the policy was in full force and effect, was injured when the rear of his parked taxi, in which he was sitting, was struck by another automobile. In this accident the plaintiff suffered a sprain of the right shoulder and neck, and a slight cerebral concussion, which rendered him momentarily unconscious.

The parties are agreed that at the time of the accident the plaintiff had osteo-arthritis, which was aggravated by the injuries received.

Dr. R. Lloyd Tegart, the plaintiff's attending physician, testified as follows:

"A He said that the rear end of his—he was a cab driver then—he said the rear end of his cab had been smashed into by another car and he received a bump on the head and injured his neck and shoulders.

"Q Now, Doctor, at the time that you saw him did you give him a physical examination?
"A Yes.

"Q What did your examination consist of?
"A He had a sore spot on top of his head where he had evidently bumped it against something. He was unable to turn his head to the right, turn his head that way to the right; it was very painful and there was a lot of muscle spasm when I examined him, and he couldn't flex or extend the head. He could turn his head to the left, not completely, but more than he could to the right. The right shoulder was very painful when the arm was manipulated, and that was about—he was complaining of headache and seeing double and blurring of vision, the usual post-concussion syndrome complaints.

* * * * *

"Q Doctor, based upon the history of the injury that the patient related to you, and your physical examination and the X-rays, what was your diagnosis of his injuries?
"A Well, he had had a cerebral concussion; he was suffering from a post-concussion syndrome, sprained neck muscles, shoulder muscles, and he had an aggravation of an arthritic condition.

* * * * *

"A Well, arthritis—I would have to start with arthritis. It is divided generally now into two classes, the osteo-arthritis and the rheumatoid. The

rheumatoid we are dealing with; that is the type that hops from joint to joint. It is very painful. Instead of the joints getting larger they usually get smaller, and there is a decalcification of the bones, the bones become crooked and the hands and the body become gnarled. That type of arthritis we can do quite a bit for with the drugs we have now. The other is the hypertrophic osteo-athritis, of which there is primary and secondary. The primary osteo-arthritis is the type that he has; he has had it for quite a while. We all do. It is just a changing process, a deterioration or degeneration of age. It is like your vascular system; it degenerates along with it. It is more prominent in the spine than anyplace else, usually. It also occurs in the weight-bearing surfaces, and there is degeneration of bone and degeneration of cartilage. It is the laying down of calcium mineral deposits which makes the bones larger. You will see them in the other type, the secondary osteo-arthritis, Heberdens nodes, which are lumps on the fingers, which is a painless thing. The body makes an adjustment usually to take care of it, unless some predisposing factor interferes with this mechanical thing and then you have pain after that.

\* \* \* \* \*

"Q Now, Doctor, he complains of persistent and constant headaches in the back at the base of his skull. Do you have an opinion as to the probable cause of that?

"A Well, part of it can be caused by the post-concussion syndrome, and he has part of that, and part of it can be caused by the osteo-arthritis he has.

\* \* \* \* \*

"Q As I understood your testimony on direct, you testified that the accident caused this man's disability?

"A Yes, it aggravated his arthritic condition; yes, it did.

\* \* \* \* \*

"Q This mild concussion you speak of, do you know whether or not Mr. Todd has recovered from that?

"A Well, he doesn't see double, he doesn't have blurring of vision; he has recovered that much. He still has his headaches. How much is due to that or how much is due to a cervical neuritis, occipital neuritis due to an aggravation of the arthritic condition in the cervical vertebrae, I don't know."

Dr. Richard F. Berg, who examined the plaintiff at the request of the defendant, testified as follows:

"On examination, he was 61 years old at that time, and my examination of his head revealed no evidence of any cranial nerve injury. I couldn't make out any definite pathology or intra-cranial pressure on examination of the discs or fundi of his eyes. His neck motions were definitely restricted, and he complained of pain and tenderness, especially on the right side of his neck, and these movements were limited in all directions. The right shoulder revealed local tenderness over the sub-acromial area, that is beneath this bone which sticks out on the shoulder, and his external and internal rotation were limited and painful. I could rotate his arm approximately three-fourths of the normal range myself but he complained of pain. His chest was not painful. Blood pressure was 120 over 80. There was a healed left hernia scar. His lower extremities were, in my opinion, within normal limits. His hip rotations were not painful. His spinal motions were limited throughout due to arthritic changes. A blood count taken revealed no definite pathology. The urine examination was within normal limits. I had X-rays taken of his head and these revealed some cloudiness of his sinuses, both the frontal and the ethmoids, and the X-ray specialist interpreted that as possibly chronic sinus infection. The X-rays taken of his neck revealed no fractures or dislocations, but well-advanced osteo-arthritis with narrowing of the car-

tilaginous interspaces between these vertebrae. The X-rays taken of his right shoulder revealed calcification in the soft tissues in the region of the subdeltoid bursa and in the soft tissues of the capsule of the shoulder itself, arthritis in and about the shoulder. X-rays were taken of his chest and these revealed no fractured ribs that I could see, and there was arthritis throughout the dorsal spine. That was the main part of my examination.

\* \* \* \* \*

"Q Now, Doctor, do you have an opinion as to whether or not the arthritic condition you found in this case contributed to the plaintiff's alleged disability?

"A Well, I think it very definitely does. He has a lot of stiffness in his spine, and that constitutes a certain amount of disability; it limits his movements and his activities.

\* \* \* \* \*

"Q Now, in most men, is it a fair statement to say that it is not a disabling condition?

"A I think that is fair, too.

"Q Now, Doctor, when a man who has osteoarthritic lipping of the vertebral bodies of the upper spine and he sustains trauma or injury of the kind that this man related to you, does it cause an aggravation of that condition?

"A Oh, yes.

"Q And is it the precipitating cause? Is the trauma the sole cause of the disability which ensues?

"A No, I don't think so, no. The aggravation is a very important factor in bringing it to the painful, disabling stage, but the groundwork is already there, unfortunately."

■ The evidence establishes the fact that the plaintiff was disabled from performing his duties as a taxi driver, and that his disability is due to the pain and

impaired body motion caused by the osteo-arthritic condition existing in plaintiff's body.

In the case of *Hutchison v. Aetna Life Ins. Co.,* 182 Or 639, 648, 189 P2d 586, this court, in construing the coverage provided in an insurance policy under wording similar to that contained in the policy under consideration here, adopted from the case of *Penn v. Standard Life Insurance Co.,* 160 NC 399, 76 SE 262, 42 LRA NS 597, the following rules by which the facts of each case are measured in determining the policy coverage:

"(1) When an accident caused a diseased condition, which together with the accident resulted in the injury or death complained of, the accident alone is to be considered the cause of the injury or death.

"(2) When at the time of the accident the insured was suffering from some disease, but the disease had no causal connection with the injury or death resulting from the accident, the accident is to be considered as the sole cause.

"(3) When at the time of the accident there was an existing disease, which, co-operating with the accident, resulted in the injury or death, the accident cannot be considered as the sole cause or as the cause independent of all other causes."

Under these rules, pre-existing disease or bodily infirmity are eliminated as factors in determining liability, unless it can be said that the disease cooperates to create the ultimate condition, that is, disability or death. In other words, if both the accidental injury and the existing disease are necessary to produce the disability or death, no recovery may be had.

It is quite evident that all of the evidence points exclusively to the continuing disability of the plaintiff as falling within the third class. The plaintiff, however, contends that the osteo-arthritis of the plain-

tiff is merely a part of the normal process of aging, and is not contained within the definition of the words "bodily * * * infirmity or * * * sickness" as used in the exclusion clause. *Long v. Railway Mail Ass'n,* 145 Neb 623, 17 NW2d 675; *Silverstein v. Metropolitan Life Ins. Co.,* 254 NY 81, 171 NE 914; *McGrail v. Equitable Life Assurance Society,* 292 NY 419, 55 NE2d 483; *Prudential Ins. Co. of America v. Carlson,* 126 F2d 607.

■ Generally, "bodily infirmity" as used in accident insurance policies is construed to be practically synonymous with "disease," and each is understood to refer to a bodily ailment of an established or settled character from which an insured is suffering. 29 Am Jur 747, Insurance § 995.

"* * * an 'infirmity' indicates weakness, feebleness, debility, fraility, disease—something that materially impairs bodily powers." *Taylor v. New York Life Insurance Co.,* 176 Minn 171, 174, 222 NW 912, 60 ALR 959.

Mr. Justice Cardozo in *Silverstein v. Metropolitan Life Ins. Co.,* supra, 254 NY 81, 84, in determining what was intended by the parties to an insurance contract in the use of the words "disease or bodily or mental infirmity" in the exclusion clause, said:

"A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency * * *."

The evidence discloses the fact that osteo-arthritis appears to some degree in practically all people from the age of 50 years upward, and may be classified as a part of the process of growing old. If we were dealing solely with the exclusion clause of the policy, weight might be given to plaintiff's argument, but we must also consider clause "A." of the policy which sets forth the coverage provided in case of disability, and which forms the basis of plaintiff's claim under this policy.

■ The coverage in this type of policy is expressly limited. The disability coverage provided does not cover the unintended injury alone, but only applies when the unintended injury occurs and a disability results directly and independently of all other causes. *Davis v. North American Acc. Ins. Co.*, 42 Wash2d 291, 254 P2d 722; *North America Acc. Ins. Co. v. Allentharp*, 164 F2d 9; *Davis v. Jefferson Standard Life Ins. Co.*, 73 F2d 330.

We cannot ignore the express provisions of the policy and, therefore, the judgment for the plaintiff must be set aside and judgment entered for the defendant.

■ Defendant, however, may not prevail upon its cross-complaint for there is ample evidence to sustain the trial court's judgment that over the period of time payments were made for disability the plaintiff was suffering from dizziness and imparied vision as a result solely of the accidental injury which disabled him from carrying on his occupation as a taxi driver.

Reversed and remanded with instructions to enter judgment in accordance with this opinion.

**ON REHEARING**

Argued and submitted on rehearing October 3, 1956.

*James H. Clarke,* Portland, argued the cause for appellant. With him on the briefs were Koerner, Young, McColloch & Dezendorf, and Wayne Hilliard, Portland.

*Nels Peterson,* Portland, argued the cause for respondent. On the brief were Peterson & Pozzi, Berkeley Lent, and Philip A. Levin, all of Portland.

PERRY, J.

Believing that we were perhaps in error in our former opinion we granted a rehearing, and having concluded that we were in error, our previous opinion is herewith withdrawn and the following now becomes the opinion of the court.

The plaintiff, having suffered from an accident, commenced this action to recover weekly indemnity payments as provided in defendant's accident policy.

This policy contract provided, if plaintiff sustained bodily injuries, that payment of benefits would be made:

"A.  If such injuries, directly and independently of all other causes, shall within twenty days from the date of accident, wholly and continuously disable the Insured and prevent him from performing each and every duty pertaining to his occupation, the Company shall pay the weekly accident indemnity for the period of such continuous total disability, but not exceeding fifty-two consecutive weeks.  After the payment of weekly accident indemnity for fifty-two weeks as aforesaid the Company shall continue the payment of the weekly accident indemnity thereafter so long as the Insured shall be wholly and continuously disabled by such injuries from engaging in any occupation or employment for wage or profit.

"B.  Or, if such injuries, directly and independently of all other causes, shall, within twenty days from the date of accident or immediately following a period of total disability covered under Section A, continuously disable and prevent the Insured from performing one or more important daily duties pertaining to his occupation, the Company shall pay for the period of such disability, but not exceeding twenty-six consecutive weeks, a weekly accident indemnity of one-half of the amount payable for total disability.

"Indemnity shall only be paid under this Part for any period of disability during which the Insured is under the regular care and attendance of a legally qualified physician or surgeon other than himself."

The policy excluded "death, disability or other loss caused or contributed to (1) by bodily or mental infirmity,  *  *  *  or (3) by any kind of sickness, *  *  *."

The defendant had paid to the plaintiff the weekly

indemnity of $50 per week for a total occupational disability to the extent of $807.14, and then refused to acknowledge further liability under the contract.

In answer to the plaintiff's complaint, the defendant alleged that the disability suffered by the plaintiff was caused or contributed to by bodily infirmity and sickness as excluded from coverage in the exception clause, and further asked for affirmative relief, seeking recovery of the payments as previously made.

A jury trial was waived, and the trial court made the following Findings of Fact:

### "III.

"That on or about November 11, 1952, while said policy was in full force and effect, the plaintiff sustained accidental bodily injuries entitling him under the terms and provisions of said policy to weekly indemnity in the sum of $50.00 from and after November 11, 1952; that plaintiff duly made claim under said policy and was paid weekly indemnity as provided by the terms of said policy until March 5, 1953 when said payments were discontinued by said defendant.

### "IV.

"That plaintiff duly made demand upon defendant for the payment of the benefits provided by said policy but said defendant failed and refused to pay the same and defendant became indebted to the plaintiff in the sum of $2,221.42 for weekly indemnity payments of $50.00 per week from March 5, 1953 to January 13, 1954.

\* \* \* \* \*

### "VI.

"That defendant did not mistakenly pay plaintiff weekly benefits of $50.00 per week in the total sum of $807.14, but paid said sum as required by said policy; that plaintiff's accidental bodily in-

juries were caused directly and independently of all other causes from accidental bodily injuries and his disability was not caused or contributed to by bodily infirmity or sickness including any pre-existing arthritic condition and/or pre-existing sinus condition and plaintiff was not rendered ineligible to receive the weekly benefits provided under said policy but on the contrary, was entitled to recover the same."

Upon these Findings of Fact, the trial court concluded that the plaintiff should recover judgment against the defendant in the sum of $2,221.42, as total disability payments due under the contract accruing subsequent to the last payment made by the defendant on March 5, 1953. Judgment was entered accordingly, and the defendant has appealed.

In general, the defendant contends there is no substantial evidence that the accidental bodily injuries suffered by the plaintiff entitle him to a recovery within the terms of the policy contract.

The solution of the problem lies in the evidence adduced as applied to the interpretation placed upon the insuring clauses and their restrictions. The evidence discloses that plaintiff, 61 years of age, while employed as a taxi driver, and at a time when the policy was in full force and effect, was injured when the rear of his parked taxi, in which he was sitting, was struck by another automobile. In this accident the plaintiff suffered a sprain of the right shoulder and neck, and a slight cerebral concussion, which rendered him momentarily unconscious.

The parties are agreed that at the time of the accident the plaintiff had osteoarthritis, which was aggravated by the injuries received.

In the case of *Hutchison v. Aetna Life Ins. Co.*, 182 Or 639, 648, 189 P2d 586, this court, in construing the

coverage provided in an insurance policy under wording similar to that contained in the policy under consideration here, adopted from the case of *Penn v. Standard Life Insurance Co.*, 160 NC 399, 76 SE 262, 42 LRA NS 597, the following rules by which the facts of each case are measured in determining the policy coverage:

"(1) When an accident caused a diseased condition, which together with the accident resulted in the injury or death complained of, the accident alone is to be considered the cause of the injury or death.

"(2) When at the time of the accident the insured was suffering from some disease, but the disease had no causal connection with the injury or death resulting from the accident, the accident is to be considered as the sole cause.

"(3) When at the time of the accident there was an existing disease, which, co-operating with the accident, resulted in the injury or death, the accident cannot be considered as the sole cause or as the cause independent of all other causes."

Under these rules, pre-existing disease or bodily infirmity are eliminated as factors in determining liability, unless it can be said that the disease cooperates to create the ultimate condition; that is, disability or death. In other words, if both the accidental injury and the existing disease are necessary to produce the disability or death, no recovery may be had.

The plaintiff contends that the osteoarthritis of the plaintiff is merely a part of the normal process of aging, and is not contained within the definition of the words "bodily * * * infirmity or * * * sickness" as used in the exclusion clause. *Long v. Railway Mail Ass'n*, 145 Neb 623, 17 NW2d 675; *Silverstein v. Metropolitan Life Ins. Co.*, 254 NY 81, 171 NE 914; *McGrail*

*v. Equitable Life Assurance Society,* 292 NY 419, 55 NE2d 483; *Prudential Ins. Co. of America v. Carlson,* 126 F2d 607.

Generally, "bodily infirmity" as used in accident insurance policies is construed to be practically synonymous with "disease," and each is understood to refer to a bodily ailment of an established or settled character from which an insured is suffering. 29 Am Jur 747, Insurance § 995.

"* * * an 'infirmity' indicates weakness, feebleness, debility, frailty, disease—something that materially impairs bodily powers." *Taylor v. New York Life Insurance Co.,* 176 Minn 171, 174, 222 NW 912, 60 ALR 959.

Mr. Justice Cardozo in *Silverstein v. Metropolitan Life Ins. Co.,* supra, 254 NY 81, 84, in determining what was intended by the parties to an insurance contract in the use of the words "disease or bodily or mental infirmity" in the exclusion clause, said:

"A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency * * *."

Therefore, if the osteoarthritis, which did not in anywise disable the plaintiff until after the accident, is a disease or bodily infirmity within the meaning of the exclusion clause, the plaintiff cannot recover.

■ In construing a contract of insurance, the courts will give as favorable a construction for the benefit

of the insured as is cognizable in the words used to prevent forfeiture. *Smith v. Ind. Hosp. Assn.,* 194 Or 525, 242 P2d 592.

The medical testimony in this case is to the effect that everyone over 50 years of age has, to some degree, osteoarthritis. The plaintiff was 60 years of age at the time he applied for insurance.

■ An accident insuring agency is not required to accept every person as a risk, and in preparing its policies it may exclude any risk as to any individual, but, unless it clearly points out the risks not assumed, it seems only logical that it accepts the risks of infirmity which are generally considered normal to mankind at the various stages of life, and, therefore, that osteoarthritis, which in common parlance may be considered normal from that which would be considered abnormal, cannot be considered as a concurring cause of disability. Therefore, under the evidence in this case, there was a question of fact to be determined.

The defendant assigns as error the entering of a judgment by the trial court in the amount of $3,271.99, "because the judgment is not supported by the pleadings or the findings."

Material to this issue, the plaintiff alleged in his complaint:

"\* \* \* \* \*

"II.

"That on or about December 28, 1951, the said defendant wrote a policy of health and accident insurance providing indemnity for loss of life, limb, sight or time, among other things, being Policy No. 682763, which policy provided for the payment of weekly indemnity benefits in the sum of $50.00 per week in the event that the plaintiff should be in-

jured by accident and should be wholly and continuously disabled and said injuries should prevent him from performing *each and every duty pertaining to his occupation.*

"III.

"That on or about November 11, 1952, while the said policy was in full force and effect, the plaintiff sustained injuries which have since said date wholly and continuously disabled him and prevent him from performing *each and every duty pertaining to his occupation*; that plaintiff duly made claim under said policy and was paid weekly indemnity as provided by the terms thereof until on or about February 1, 1953, when said payments were discontinued by said defendant.

"IV.

"That heretofore plaintiff made demand upon defendant for the payment of the benefits as provided by said policy, but said defendant has failed and refused to pay the same, and defendant is indebted to plaintiff on said policy in the sum of $400.00 to the present time; that plaintiff will be wholly and continuously disabled for an indefinite time in the future by reason of the injuries aforesaid." (Italics supplied)

Plaintiff demanded judgment accordingly. By an alleged supplemental complaint, plaintiff adopted all of the allegations of paragraphs I, II, and III of the original complaint, and in the same language of paragraph IV (being paragraph II in the supplemental complaint) alleged the indebtedness of the defendant to be $2,000.

The plaintiff's original complaint alleges a contract of insurance which provided "for the payment of weekly indemnity benefits in the sum of $50.00 per week in the event that the plaintiff should be injured by accident and should be wholly and continuously

disabled and said injuries should prevent him from performing *each and every duty pertaining to his occupation.*'' (Italics supplied). This allegation clearly states that the claim is based upon the first sentence of section A of the insurance contract, which provides for occupational disability, and not to the second sentence, which refers to general disability. The policy itself is not pleaded, and, therefore, demand pleaded in paragraph IV of the original complaint and paragraph II of the supplemental complaint refers to the injury which prevents him from performing his usual and customary occupation.

The words added in paragraph IV of the original complaint and in paragraph II of the supplemental complaint, ''that plaintiff will be wholly and continuously disabled for an indefinite time in the future'', likewise, can refer solely to the occupational disability, for nowhere in the complaint is there any statement that the contract of insurance provided insurance against disabling injuries that prevented him from engaging in any occupation or employment for wage or profit. The plaintiff contends, however, that since no demurrer or motion was filed to the supplemental complaint this objection was waived.

The rule of aider by verdict approved and followed by this court was well-stated by Mr. Justice ROBERT S. BEAN in *Booth v. Moody,* 30 Or 222, 225, 46 P 884:

''* * * The extent and principle of the rule of aider by verdict is that whenever the complaint contains terms sufficiently general to comprehend a matter so essential and necessary to be proved that, had it not been given in evidence, the jury could not have found the verdict, the want of a statement of such matter in express terms will be

cured by the verdict, because evidence of the fact would be the same whether the allegation of the complaint is complete or imperfect. But if a material allegation going to the gist of the action is wholly omitted, it cannot be presumed that any evidence in reference to it was offered or allowed on the trial, and hence the pleading is not aided by the verdict. The rule in such cases, as laid down by Mr. Proffatt in his work on Jury Trials, and which seems to have been adopted by this court in Houghton v. Beck, 9 Or 325, is that 'a defect in pleading, whether of substance of form, which would have been fatal on demurrer, is cured by verdict, if the issue joined be such as necessarily required on the trial proof of the facts defectively stated or omitted, without which it is not to be presumed that either the judge would direct the jury to give, or that the jury would have given the verdict': Proffatt on Jury Trials, § 419.''

■ It is a well-established rule of law that, where no attack has been made upon a pleading by demurrer, the complaint will be liberally construed to state a cause of action after verdict. *Nicholson v. Jones,* 194 Or 406, 242 P2d 582.

■ The difficulty with plaintiff's position is that the policy of insurance contemplates coverage for different circumstances. The first sentence of section A of the policy provides indemnity for a period of 52 weeks to the assured for loss suffered in being unable to carry on his usual and customary occupation; the sentence following indemnifies him at the expiration of the 52 weeks as an individual who is so disabled as to be unable to perform any work or follow any occupation for wages or profit. They are separate and distinct in their intended coverage. *Dullum v. Northern Life Ins. Co.,* 169 Or 233, 127 P2d 749; see also annotation 149 ALR 7. Each coverage is a separate cause of

action or right arising out of the policy. *Walker v. Fireman's Fund Ins. Co.,* 114 Or 545, 234 P 542.

At the time the original cause of action was filed for recovery under the policy for occupational disability, no right of recovery existed for total disability and this could only be brought in by supplemental complaint. *Walker v. Fireman's Fund Ins. Co.,* supra.

ORS 16.360 reads as follows:

"The plaintiff and defendant, respectively, may be allowed on motion to make a supplemental complaint, answer or reply, alleging facts material to the case, occurring after the former complaint, answer or reply."

This statute permitting supplemental pleadings requires the setting forth of the new facts that have occurred since the filing of the original complaint which will enlarge or change the kind of relief to which a plaintiff may be entitled. *May Stores, Inc. v. Bishop et al.,* 131 Or 670, 282 P 1080.

It will be noted that no new facts are alleged in the supplemental complaint which are not contained in the original complaint. The plaintiff in his original complaint stated a good cause of action to recover for occupational disability under the policy. His supplemental complaint asks only for additional sums of money in the identical wording of the original complaint. While this may be sufficient pleading to include the accruing weekly sums provided in the first sentence in the policy, we are of the opinion that, having stated a good cause of action which was not demurrable under his original complaint, the plaintiffs' supplemental complaint was not sufficient to enlarge the original complaint to include therein a new cause of action upon an entirely different coverage included in the policy

that could not have been maintained when the suit was commenced.

The defendant also complains that the trial court failed to make specific findings of fact sufficient to sustain the judgment.

Had the trial court made a sufficient finding of fact to the effect that the plaintiff was disabled from engaging in any occupation or employment for wage or profit, such a finding could not stand as it lay beyond the issues raised by the pleadings. *McMillan v. Montgomery, et al.,* 121 Or 28, 253 P 879.

An examination of the judgment shows that the trial court must have considered and adjudicated upon the plaintiff's inability to engage in any occupation for wage or profit. Therefore, this cause must be reversed with leave for the plaintiff to apply to the trial court for permission to file a supplemental complaint. *Larsen v. Martin,* 172 Or 605, 143 P2d 239.

Since this case must be retried, we have refrained from discussing the evidence as much as possible.

Reversed and remanded.